Frink *v.* McClung.

John Frink, Junior, appellant, *v.* Absalom B. McClung, impleaded, &c. appellee.

| 4g | 569 |
|------|------|
| 193 | 4156 |

*Appeal from Peoria.*

Before a Court of Chancery will entertain a bill praying for a new trial on the ground of accident, loss of papers, &c. it must sufficiently appear to the Court that error was committed by the decisions of the Court at Law in matters of substance.

An interest which will render a witness incompetent must exist at the time when he is offered for examination, or when his deposition is taken.

An honorary obligation will not constitute a disqualifying interest in a witness.

All exceptions to depositions, which go to the form of the same, or to the incompetency of witnesses must be made before the case is called for trial and submitted to the jury. Objections to their substance, however, may be made on the trial.

BILL IN CHANCERY, for a new trial, &c. filed in the Peoria Circuit Court by the appellant against the appellee, and

finally heard before the Hon. John D. Caton, at the October term 1847, when the injunction was dissolved and the bill dismissed.

So much of the record as is material to the determination of this case, is adverted to by the Court in their Opinion.

*H. O. Merriman,* for the appellant.

*O. Peters,* and *C. Ballance,* for the appellee.

The Opinion of the Court was delivered by

KOERNER, J.*   This was a bill in Chancery, filed in the Peoria Circuit Court to the October term 1845, praying for an injunction, and asking relief by granting a new trial out of Chancery in a certain cause theretofore decided in the Circuit Court of said county, wherein one A. B. McClung was plaintiff, and Frink and Trowbridge were the defendants.   In this bill, as amended, Frink was the sole complainant, and said McClung, Trowbridge and S. Frye, the sheriff of Peoria county, were the respondents.   McClung answered, not under oath, the same having been waived by complainant; the other defendants made default.   The answer denies many substantial allegations in the bill.   The complainant replied generally, and depositions having been taken by both parties, the cause was finally heard at the October term 1847, and the Court dissolved the injunction and dismissed the bill. From this decree, the complainant Frink has taken an appeal to this Court.

*The record is so* exceedingly voluminous, that it would be impracticable to give more than a very general outline of this case, which is presented in a record covering about eighty closely written pages.

At the October term 1840, McClung, the respondent below and appellee here, sued Frink and Trowbridge in *assumpsit,* claiming compensation for his services in carrying the

---

*WILSON, C. J. and PURPLE, J. did not sit in this case.

mail under a certain agreement, from some time in February, 1838, to the first of January, 1840, and also damages for being prevented from carrying it from said first day of January, 1840, to the commencement of the suit. From the language of the pleas, as given in the record from the recollection of Frink's counsel, it is fairly inferrable that there were several counts in the declaration, though it does not appear with certainty that it contained the common counts. Several pleas were filed, and issues joined thereon, and finally, at the April term 1842, the cause was submitted to a jury, who found a verdict for plaintiff, amounting to $330·33. During the pendency of the suit, and upon the trial, various exceptions to the decisions of the Court were taken by defendants' counsel, a motion was made for a new trial, which was overruled, and the decision of the Court also excepted to. Judgment was rendered by the Court for the amount of said verdict. The Court being on the eve of adjournment for the term, when said motion was decided, it was agreed by the counsel for both parties, that a bill of exceptions might be prepared after adjournment, to be signed by the then presiding Judge of that Circuit in vacation.

An appeal was prayed for and granted, and the appeal bond executed by defendant Frink and security. The bill of exceptions was prepared, and, together with all the original papers in the case, came into the hands of the Judge in vacation. Said bill of exceptions, and a great portion of the material papers in the case were casually lost, and have not been recovered. The appeal taken to the Supreme Court was consequently dismissed for want of a record, and Frink and Trowbridge obtained a stay of the execution issued upon the judgment, with a view to have the original papers supplied below, so as to enable them to make up another bill of exceptions, and to procure a reversal of the judgment. The proceedings under this motion to set aside the execution, extended through several terms, and finally proved unsuccessful, the Court overruling said motion, on the ground, as it is alleged, that defendants' counsel were unable to properly supply the pleas which had been lost with other papers.

As before stated, the object of the bill is to obtain a new trial at law, for the reason that by the loss of the papers in the cause, as the complainant alleges, he has been deprived of his important right to appeal and to have the errors, which he avers have been committed to his disadvantage, corrected by the proper tribunal.

The jurisdiction of a Court of Chancery to afford relief in a proper case of this kind, is undoubted. Concerning the loss of these papers, the respondent McClung, at least, has no right to lay the blame on the complainant. It is very true that the practice of preparing bills of exceptions and having them signed by the Judge in vacation, is one which is frequently productive of embarrassments, and is in strictness, irregular. But necessity has often induced, and the practice consequently sanctioned such a proceeding to a certain extent, though it is very desirable that it should be resorted to only in cases of the utmost necessity. In this case, however, the counsel for McClung assented to its being done, and of course cannot now object to it. But before a Court of Chancery will extend relief in cases of this class, it must necessarily inquire into the substantial merits of every case. It is not enough that it should be satisfied that a loss or accident actually has occurred, which possibly might have deprived a party of his rights, but it has first to institute an inquiry, whether, in fact, important rights have existed, the assertion of which has become impracticable through such casualty. In other words, it must sufficiently appear to the Chancellor that error was committed by the decisions of the Court at Law, on matters of substance, before it will restore the parties to their original position. It would be unjust in the highest degree to the successful party in the Court at Law, to allow to his adversary the experiment of another trial, if it were apparent that the Court decided correctly the first time, or at any rate decided in such a way as could not have affected the merits of the case. We must examine, then, into the alleged errors of the Court, and unless we are convinced that they were such as to have made it probable in the highest degree, that they would have pro-

duced a reversal in the Court of appeal, we cannot reverse the decree which was rendered by the Court below.

It is proper, however, that another, and it might be said, the main feature in this bill, which the complainant has prominently placed in the foreground, should be adverted to before proceeding further. The bill, besides alleging that errors prejudicial to complainant have occurred, sets out at length another unfortunate accident attending the trial of this cause, and much pains appear to have been taken to establish it by proof. It is contended in the bill, and has been argued on the hearing here, that that accident alone would entitle the complainant to the relief sought. We allude to the fact, that the complainant Frink was absent at the trial, and that certain receipts for $200, given by McClung for money paid him by Frink and Trowbridge, were also beyond the reach of complainant's counsel. The history of this portion of the case is something like this: At the trial, Mr. Frink was in Washington City on important business with the Post Office department. The above mentioned receipts for $200 had some time before the trial, accidentally, as it is alleged by him, fallen into the hands of McClung, but had been given up by the latter under an order of Court, to the attorneys of Frink, at Peoria. McClung was indicted in Chicago for stealing these receipts, and for the purpose of using them on the trial, they were placed in possession of the prosecuting attorney at Chicago, by a partner of Mr. Frink. Previous to the trial, the counsel for Frink in Peoria applied for them to Mr. Walker, who called upon the prosecuting attorney for them. They happened to be mislaid and could not be found, and were consequently not forthcoming upon the trial. The bill of complainant ascribes the defeat of Frink and Trowbridge in the said suit, principally, to these untoward circumstances.

In regard to the absence of Frink, it is sufficient to remark, that it is not shown that it was unavoidable. Neither the act of God, nor any legal process prevented him from being present. When one has several important matters to attend

to, he must decide on their relative claims ·to his attention, and after having determined to prosecute one, runs the risk of the consequences, if he neglect another. It is not perceived, however, how his presence could have mended the matter. The receipts were mislaid, and as he had no knowledge where they were, his agency in the matter would have been of no avail. If Frink's counsel had thought it indispensably necessary to have these papers, in order to secure success at the trial, he ought to have made an effort at least, to have the cause continued. Under the circumstances, as far as we can now judge of them, he would have been entitled to a continuance. As he has not done so, he ought not now to complain.

It seems to be pretty clear, however, for several reasons, that the complainant is mistaken in supposing that the want of these receipts produced the unfavorable verdict. In the first place, according to his showing, McClung was entitled, under the contract, to $562·35. He did produce receipts to the jury, to the amount of $280·00. Now, if the jury had allowed that amount only, as paid, still their verdict could have been but $282·00, instead of $339·00. This hypothesis, then, fails to explain the verdict. But in the next place, the counsel for McClung gave in evidence a memorandum made by him from these identical receipts, while they were in his possession, stating the dates and amounts, making a little upwards of $200·00. This testimony, coming from the adverse party himself, was very conclusive, and it would be unreasonable, indeed, to suppose that they disregarded it. The original receipts were amply supplied by this testimony. The jury, then, in allowing $480·00 as paid by defendants, as they undoubtedly did, and still finding so much in favor of defendant, must have found that he was entitled to much more than the complainant was willing to allow him.

It is also alleged in the bill, that the testimony of one of the witnesses, who heard Frink admit, before the suit was commenced, that he owed the plaintiff, McClung, some inconsiderable amount, could be contradicted. But even if

this statement was much more distinct and explicit than it is, this would certainly be no reason for a new trial, as is well settled by many decisions.

We will now pass to the alleged erroneous decisions of the Court during the progress of the cause. It happens that certain objections were made as to the proper form, &c. &c., of the depositions of Hobbie and others, which the Court overruled. The record does not show what they were, and, consequently, we cannot decide whether they were well founded or not. The presumption is, that the Court below decided correctly. A more serious objection was made to the depositions of Havens and Brown, and the record discloses the nature of it. Havens and Brown, at the April term 1841, were present as witnesses for McClung. They were anxious to depart, and it was proposed to take their depositions. Frink consented to have their depositions taken, provided McClung would give security for costs. McClung, Frink not being then present, requested them to go his security upon the bond for costs, which they agreed to do. Their depositions were then taken, and the next morning they executed the bond for costs. The evidence is conflicting whether the fact of their having gone security was communicated to Frink or his counsel before the bond was executed, or not. The counsel learned it, however, very soon, and obtained, at the same term, an affidavit of one Bell, proving these facts. Upon the trial, these depositions were objected to, as being given by incompetent witnesses, and the affidavit of Bell was then read for the first time, and also the bond for costs, to which their names were affixed.

It is contended by complainant, that in a Court of Law, the depositions of a witness, who has become interested after their being taken, cannot be given in evidence. This rule, which is not recognized in Courts of Chancery, is said to be founded on a case in 1 Salk. 286, and on decisions made upon its authority, in 1 Peere Williams, 287, and 1 Strange, 101. It may well be doubted, whether, upon a critical examination, these cases do support the general doctrine, as asserted by complainant. They are all cases, where the

witness himself had become a party to the record, or where his depositions *de bene esse* had been taken before he became interested, in which latter case they were not permitted to be read on account of the existence of a mere technical rule, that such depositions can only be read in the event of witness' death. But even if the cases alluded to could be considered as establishing such a doctrine, we would not feel inclined to consider it as law. The correct and reasonable rule is certainly the one adopted by the Courts in Chancery, which is, that the interest which will render a witness incompetent must exist at the time when he is offered for examination, or when his deposition is taken. Mr. Greenleaf (1 Greenl. Ev. § 168,) evidently assumes this to be the true rule. It is suggested, however, that in the present case, inasmuch as the witnesses had agreed before they deposed, to become security for costs, they were really interested when their depositions were taken. It may well be admitted, that in honor and conscience, they were bound by their mere promise, but still, it is equally clear, that they were not legally bound to pay the costs, consequently, not legally interested until they had executed the bond. It nowhere appears, that they even believed themselves liable, after they had verbally agreed to become securities. Had they believed so, the question might not be of so easy solution, as the authorities are somewhat conflicting on that point. But most that we can presume in the present case is, that they might have felt under an honorary engagement, at the time they gave their testimony, to comply with their promise. It is laid down by all the writers on evidence, that an honorary obligation shall not constitute a disqualifying interest in the witness, and repeated decisions, both in England and in this country, have well settled this principle. 1 Campb. 145; 1 Strange, 129; 8 Johns. 462; 9 do. 219; 4 Wend. 292; 3 Pick. 108; 6 Conn. 365; 3 Gill & Johns. 282.

But there is another reason, why the decision of the Court in overruling the exceptions to the depositions on account of the incompetency of the witnesses, was not erro-

neous.   The fact of these witnesses having agreed to become
securities before their depositions were taken, and of their
having signed the bond, was made known to complainant
about the time when it was done.   The evidence to establish
their supposed disqualification, was instantly prepared, Bell
having made his affidavit on the 2nd April, 1841, and yet no
steps were taken, either at that term, or at the intervening
term, or at the term when the case was finally disposed of,
(April term 1842,) previous to the trial, in order to exclude
said testimony on account of this objection, which had rested
in complainant's knowledge for a whole year.   The record
shows, that Bell's affidavit, and the bond for costs, were pro-
duced upon the trial, and the objection then taken for the
first time.   It is a well established and universal rule on the
Circuit, which, in some of the Circuits is one expressly en-
tered on the record, that all exceptions to depositions, which
go to the form of the same, or to the incompetency of wit-
nesses, should be made before the case is called for trial,
and submitted to the jury.   Mr. Starkie says: "The objec-
tion to competency ought to be taken, in the first instance,
previous to an examination in chief, for otherwise the party
objecting might suspend the objection for the purpose of ob-
taining an unfair advantage."   Starkie's Ev. 122.   Besides,
were it otherwise, the trial would be interrupted, and the
time of the jury taken up by hearing and deciding motions of
this character.   The objection was taken altogether too
late, and the Court was well justified in overruling it.   In
regard, however, to the substance of the depositions, as well
as of other testimony alleged to have been prejudicial to the
plaintiffs' rights, the objection was properly made  upon the
trial, and we have, therefore, to proceed now to an examination
of the question, whether any testimony besides such as came
from the Post Office department, in relation to the length
of the mail route in question, could be properly received
under the contract declared upon, or the state of the
pleadings generally, as it appears to have existed.   It is
necessary, here, to state sufficient from the record to make
the controversy on this point intelligible.   In doing so, how-

ever, we must be careful not to confound the testimony taken by the parties to this bill of complaint, with the evidence as it appeared upon the trial, for it is the latter alone which we have to examine, in order to determine upon the correctness of the decisions of the Court.

In June, 1837, the Post Office department issued an advertisement inviting proposals for the transportation of mails, amongst others, on route No. 2807, from Ottawa to Bloomington, Illinois, sixty five miles and back once á week, the service to commence on first January, 1838, and to terminate June 30th, 1842. On the 23d of October, 1837, Frink and Trowbridge put in written proposals to carry the mail from Bloomington to Crow Meadow, ( a place between Bloomington and Ottawa, though not on a direct line, but lying considerably west of both places, and consequently covering but a portion of the whole route from Bloomington to Ottawa,) at ten dollars per mile per annum, which was recorded under the number 2807, and accepted by the department. On the first day of February, 1838, the plaintiff McClung on the one part, and Frink and Trowbridge on the other part, entered into the following agreement:

"The said McClung, for and in consideration of the compensation hereinafter expressed, to be paid him by the said Frink and Trowbridge, agrees with the same to transport the United States mail on horseback, from Ottawa, LaSalle county, Illinois, to Crow Meadow, Illinois, by way of Hudson and Josephine, and back once a week until 30th June, 1842, inclusive; and said Absalom further agrees with said Frink and Trowbridge, to comply with all the regulations of the General Post Office and requisitions of all the U. S. laws in the transportation of said mail, and to preserve and save harmless the said Frink and Trowbridge from all liabilities which they may incur from being the original contractors for carrying said mail; and said Frink and Trowbridge agree and covenant to pay to said McClung or order, at the rate of eight dollars per mile per annum, for each and every mile in distance from Ottawa to Crow Meadow, by way of Hudson and Josephine; said distance to be ascertained and fixed

by the General Post Office department, and said payment to be made quarterly. And it is mutually agreed between said parties, that in case the General Post Office department shall make any alterations in said route, that the compensation for carrying said mail shall be raised as to distance, agreeably to said alteration; and said agreement shall still be binding and remain in full force in every other respect, &c. &c.

(Signed)  A. B. McClung.

Frink & Trowbridge."

On the 17th of May, 1838, an order was made by the Postmaster General directing the said contractors to commence at Crow Meadow, and run thence once a week by Hudson and Josephine to Bloomington, forty miles, at $400 per annum, and back the same road; and the indenture was executed on the 17th of May, 1838, to take effect 1st January, 1838. The number of said route remained the same as before.

Now, it is evident from this, that an error was committed by the department. The bid of Frink and Trowbridge was for the route from Bloomington to Crow Meadow, which was accepted, but this route was still called 2807, although this was the number of the route from Ottawa to Bloomington, as advertised. From the order made on the 17th of May, directing the contractors to run the route, for which they had really contracted, it is plain that they must have run a different route in the first place, under the misdirections of the department. McClung carried the mail from Ottawa to Crow Meadow by Hudson and Josephine, a distance, as alleged by him, of eighty four miles, commencing some time in February, 1838, for about three months. From May, 1838, McClung carried the mail from Ottawa to Bloomington, sixty five miles, as ascertained by the department, until the first of July, 1838, when he finally carried it on the route from Bloomington to Crow Meadow, forty miles, which was the route originally bid for by Frink and Trowbridge, and in accordance with the order of the department, made May 17th, 1838, until February, 1840.

Before the order of the department was made in May,

which came to be executed about the first of July, the mail was carried by different routes, and over a much greater distance than forty miles. Nevertheless, the department ordered that the indenture then executed with Frink and Trowbridge, the original contractors, should take effect from the first of January, 1838, covering five months of the service performed by McClung, under his express contract with Frink and Trowbridge, which was liable, it is true, to be altered as regards the routes, by the directions of the department, but was not altered to the forty mile route until July. It is our opinion, that he, as sub-contractor, was not bound to submit to such retrospective orders. It is known, as a matter of history, that the Post Office department, in its dealings with contractors, manages things in a peculiar way, not altogether consistent with the scrupulous and legal notions of Courts of Law; that they consider the necessities of the service as overruling every other consideration; and that compensation for injuries sustained is not often voluntarily granted. The contractors know this, and consider the instability of their contracts before they enter into them. It is different with those who contract with the original contractors. If they were liable to conform to the ever changing, and often oppressive orders of the department, without having a claim for compensation on the main contractors, their situation would be bad indeed, as they have no means to urge and prosecute their claims in the department. The principal contractors, if their sub-contractors were to be affected by the rules of the department, and not they themselves, might take but little interest in pressing and obtaining just demands in the department, leaving the sub-contractors without any remedy at all. How could McClung, when he carried the mail for a while, first eighty miles, then sixty five miles, have ever supposed that the department would allow only forty miles, the distance of the last route, as fixed by the department, and that all three different routes should be called one and the same, and should be considered as being all equally long? His contract with Frink and Trowbridge, when properly understood, means no such thing.

Frink *v.* McClung.

It appearing from the deposition of Hobbie, read at the trial, that the distance from Bloomington to Crow Meadow was fixed by the department, at forty miles, there is no question that McClung was entitled to compensation at that rate, from the first of July, 1838, until the first of February, 1840. This is not denied by Frink. The distance from Bloomington to Ottawa was also ascertained by the department (see proposals) to be sixty five miles. On this route, the evidence shows, the mail was carried by McClung from the first of May to the first of July, or thereabouts. He is entitled to compensation for this service at the rate of sixty five miles.

As against his recoving for services performed on the first route, from Crow Meadow to Ottawa, the one specified in his contract, it is urged that he failed to show that eighty two miles was the distance, as ascertained by the department. If it anywhere appeared that the department had ever fixed the distance on that route, he would certainly be bound by such ascertainment. But for aught we know, it was never fixed, as no such route is spoken of either in the proposals of the department, the bid of Frink and Trowbridge, or in the subsequent order. In the absence of the action of the department, was McClung to lose his rights, by having obtained no standard by which to measure them? We think not. It was Frink's duty, when he was apprised of the claim, to have got the department to ascertain said distance, but it seems that he relied entirely on the fact that the department had fixed the distance of another and different route, which route it had pleased to direct might be considered as the original one.

There is another view of this matter, however. The witnesses who swear to the distance from Ottawa to Crow Meadow by Hudson and Josephine, as being eighty two miles, were Postmasters on the route. They are agents, or rather parts of the department, and expressly swear that the head of the department fixes distances according to the information obtained from Postmasters. It is not perceived how their testimony, even if they could not be considered the department itself, could have prejudiced the complainant, as

it is undeniable, that any evidence of the length of the route, if it had been given by the department, would have been but the echo of their official statements. We think that, under all the circumstances of the case, the evidence was properly admitted. It is likely from the verdict that a small amount of damages was allowed to McClung, on account of the contract being taken away from him, before the time of service contracted for had expired. The evidence below is favorable to McClung on this point. It is shown that, by the direction of Frink, he was not permitted to carry the mail any longer, and no sufficient ground is made out, as far as the evidence on the trial below goes, for this rescission of the contract on Frink's part. The declaration of McClung not only claimed compensation for services performed, but also contained counts claiming damages for rescission of contract. Entertaining these views of the case, it follows as a necessary consequence, that we cannot see error in the decision of the Court in overruling the motion for a new trial, or in refusing the last instructions asked by Frink's counsel below, which assumed the ground, that McClung was not entitled to recover, if he had failed to prove the length of the route from Ottawa to Crow Meadow was ascertained by the department, for carrying the mail on that route.

Being of opinion, then, that the rights of the complainant, in matters of substance, have not been prejudiced by any thing that happened on the former trial, and that the loss of the papers could not have affected him, as a record of them would not have shown such errors as would have produced a reversal below, we come to the conclusion, that the Court below did not err in dismissing the complainant's bill and dissolving the injunction. Decree below affirmed with costs.

*Decree affirmed.*